**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | |
|---|---|
| *In re TalentLaunch Data Breach Litigation* | Case No.: 1:24-cv-0456 |
| | District Judge Patricia A. Gaughan |
| | Magistrate Judge Jonathan D. Greenberg |

<u>**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**</u>
**(With Jury Trial Demanded)**

Plaintiffs James Christian, Steve Buyck, Charles Leland Perry III, David Barker, and Amanda Lenz ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Alliance Solutions Group, LLC d/b/a TalentLaunch ("TalentLaunch" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

**I.      INTRODUCTION**

1.      Plaintiffs bring this class action against TalentLaunch for its failure to properly secure and safeguard Plaintiffs' and other similarly situated TalentLaunch customers' names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, passport numbers, financial account information, digital signatures, medical information, health insurance information, biometric information, and mother's maiden names (the "Private Information") from hackers.

2.      TalentLaunch, based in Independence, Ohio, is a nationwide network of independently operated staffing and recruitment firms that serves thousands of individuals throughout the United States.

3.      On or about March 1, 2024, TalentLaunch filed an official notice of a hacking incident with the Maine Office of the Attorney General.[1] Under state and federal law, organizations must report breaches involving PHI within at least sixty (60) days.

4.      On or around the same time, TalentLaunch also sent out data breach letters (the "Notice") to individuals whose information was compromised as a result of the hacking incident.

5.      Based on the Notice sent to Plaintiffs and "Class Members" (defined below), unusual activity was detected on some of its computer systems on May 31, 2023. In response, Defendant launched an investigation. TalentLaunch's investigation revealed that an unauthorized party had access to certain files that contained sensitive client information, and that such access took place on an undisclosed date (the "Data Breach"). Yet, TalentLaunch waited eight months to notify the public that they were at risk.

6.      As a result of this delayed response, Plaintiffs and Class Members had no idea for eight months that their Private Information had been compromised, and that were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

7.      The Private Information compromised in the Data Breach contained highly sensitive client data, representing a gold mine for data thieves. The data included, but is not limited to, names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, passport numbers, financial account information, digital signatures,

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/bc811c89-5a7b-44a5-a49d-d74fcc98a27c.shtml (last visited June 12, 2024)

medical information, health insurance information, biometric information, and mother's maiden names that TalentLaunch collected and maintained.

8.     Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns and insurance claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.     There has been no assurance offered by TalentLaunch that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.     Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.     Plaintiffs bring this class action lawsuit to address TalentLaunch's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiffs and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

12.     The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to TalentLaunch, and thus TalentLaunch was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.     Upon information and belief, TalentLaunch failed to properly monitor and security practices with regard to the computer network and systems that housed the Private Information. Had TalentLaunch properly monitored its networks, it would have discovered the Breach sooner.

14.     Plaintiffs' and Class Members' identities are now at risk because of TalentLaunch's negligent conduct as the Private Information that TalentLaunch collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for Negligence, Negligence *Per Se*, Breach of contract, Breach of Implied Contract, Unjust Enrichment, Breach of Fiduciary Duty, Breach of Confidence, and Declaratory Judgment.

## II.     PARTIES

17.     Plaintiff James Christian is, and at all times mentioned herein was, an individual citizen of the State of Ohio (where he intends to remain).

18.     Plaintiff Steve Buyck is, and at all times mentioned herein was, an individual citizen of the State of Maine (where he intends to remain).

19.     Plaintiff Charles Leland Perry III is, and at all times mentioned herein was, an individual citizen of the State of Maine (where he intends to remain).

4

20.     Plaintiff David Barker is, and at all times mentioned herein was, an individual citizen of the State of Ohio (where he intends to remain).

21.     Plaintiff Amanda Lenz is, and at all times mentioned herein was, an individual citizen of the State of Ohio (where she intends to remain).

22.     Defendant Alliance Solutions Group, LLC d/b/a TalentLaunch, is a staffing and recruitment firm with its principal place of business at 6161 Oaktree Blvd., Suite 130, Independence, Ohio 44131.

## III.     JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100. Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A) because many putative class members, including Plaintiff Buyck and Plaintiff Perry III, are citizens of a different state than Defendant.

24.     This Court has jurisdiction over TalentLaunch because TalentLaunch operates in and/or is incorporated in this District.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and TalentLaunch has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A. TalentLaunch's Business and Collection of Plaintiffs' and Class Members' Private Information

26.     TalentLaunch is a nationwide network of independently operated, commonly owned, staffing and recruitment firms. Founded in 2016, in addition to staffing solutions, TalentLaunch also provides shared programs for accounting and finance, information technology,

marketing, and strategic advisory services. TalentLaunch serves thousands of clients in Ohio and 44 other states.

27.     As a condition of receiving staffing and recruitment services, TalentLaunch requires that its clients entrust it with highly sensitive personal and health information. In the ordinary course of receiving service from TalentLaunch, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

28.     In its Notice letter, Defendant states that "The privacy and security of the personal information entrusted to us is of the utmost importance to Alliance Solutions Group, doing business as TalentLaunch."[2] In its Privacy Policy, TalentLaunch promises its clients that your "personal information will be processed in a manner that ensures appropriate security of the personal information, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures."[3]

29.     Thus, due to the highly sensitive and personal nature of the information TalentLaunch acquires and stores with respect to its clients, TalentLaunch promises to, among other things: keep clients' Private Information private; comply with industry standards related to data security and the maintenance of its clients' Private Information; inform its clients of its legal duties relating to data security and comply with all federal and state laws protecting clients' Private Information; only use and release clients' Private Information for reasons that relate to the services it provides; and provide adequate notice to clients if their Private Information is disclosed without authorization.

---

[2] *See* Notice Letter.
[3] See https://mytalentlaunch.com/privacy-policy/ (last visited June 12, 2024).

30.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, TalentLaunch assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

31.     Plaintiffs and Class Members relied on TalentLaunch to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B.  The Data Breach and Defendant's Inadequate Notice to Plaintiffs and Class Members**

32.     According to Defendant's Notice, it learned of unauthorized access to its computer systems on May 31, 2023, with such unauthorized access having taken place on an undisclosed date.

33.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, passport numbers, financial account information, digital signatures, medical information, health insurance information, biometric information, and mother's maiden names.

34.     On or about March 1, 2024, roughly eight months after TalentLaunch learned that the Class's Private Information was first accessed by cybercriminals, TalentLaunch finally began to notify clients that its investigation determined that their Private Information was impacted.

35.     TalentLaunch had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

36.     Plaintiffs and Class Members provided their Private Information to TalentLaunch with the reasonable expectation and mutual understanding that TalentLaunch would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

37.     TalentLaunch's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

### C.  Defendant Knew of the Risk it Faced

38.     TalentLaunch knew or should have known that its electronic records would be targeted by cybercriminals and that companies that collect and maintain the Private Information at issue in this case are susceptible targets for data breaches.

39.     There were many high-profile data breaches in the months and years leading up to the Data Breach.

40.     In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[4]

41.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their clients' confidential information:

> Cybersecurity is not just a technical issue; it's a client safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of clients' health and financial information, but also client access to care.[5]

---

[4] See 2021 Data Breach Annual Report, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://www.idtheftcenter.org/wp-content/uploads/2022/06/ITRC-Annual-Report- 2021_Final-1.pdf.
[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*:
https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on June 12, 2024).

42.     The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[6] In 2022, the largest growth in compromises occurred in the healthcare sector.[7]

43.     As a firm that collects and maintains PHI, TalentLaunch knew, or should have known, the importance of safeguarding its clients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on TalentLaunch's clients as a result of a breach. TalentLaunch failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D. TalentLaunch Failed to Comply with HIPAA

44.     Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

45.     TalentLaunch's Data Breach resulted from a combination of insufficiencies that indicate TalentLaunch failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from TalentLaunch's Data Breach that TalentLaunch either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

---

[6] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on June 12, 2024).

[7] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on June 12, 2024).

46.     Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by C.F.R. § 160.103.

47.     45 C.F.R. § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

48.     45 C.F.R. § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

49.     Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 C.F.R § 164.402.

50.     Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

51.     Based upon Defendant's Notice to Plaintiffs and Class Members, TalentLaunch reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

52.     Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

53.     TalentLaunch reasonably believes that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR,

Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

54.     Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

55.     Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

56.     TalentLaunch reasonably believes that Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

57.     It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

58.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

59.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 C.F.R. § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that

future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

60.     In addition, TalentLaunch's Data Breach could have been prevented if TalentLaunch had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its clients.

61.     TalentLaunch's security failures also include, but are not limited to:

a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to ensure the confidentiality and integrity of electronic protected health information TalentLaunch creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of C.F.R. § 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, *et seq.*

62. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414 also required TalentLaunch to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

63. Because TalentLaunch has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure TalentLaunch's approach to information security is adequate and appropriate going forward. TalentLaunch still maintains the PHI and other highly sensitive PII of its current and former clients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

13

### E. TalentLaunch Failed to Comply with FTC Guidelines

64.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

65.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

67. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68. As evidenced by the Data Breach, TalentLaunch failed to properly implement basic data security practices. TalentLaunch's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

69. TalentLaunch was at all times fully aware of its obligation to protect the Private Information of its clients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. TalentLaunch Failed to Comply with Industry Standards**

70. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

71. Some industry best practices that should be implemented by businesses dealing with sensitive PHI like TalentLaunch include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

72.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

73.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

74.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**G. *TalentLaunch Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information***

75.    In addition to its obligations under federal and state laws, TalentLaunch owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. TalentLaunch owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

76.     TalentLaunch breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. TalentLaunch's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b.   Failing to adequately protect clients' Private Information;

   c.   Failing to properly monitor its own data security systems for existing intrusions;

   d.   Failing to sufficiently train its employees regarding the proper handling of its clients Private Information;

   e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

   f.   Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

   g.   Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

77.     TalentLaunch negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

78.     Had TalentLaunch remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security

systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

79.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with TalentLaunch.

### H. TalentLaunch Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

80.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[8] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

81.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

---

[8] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on June 12, 2024).

82.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

83.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

84.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

85.     One such example of this is the development of "Fullz" packages.

86.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

87.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

88.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[9] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

89.     Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social

---

[9] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited June 12, 2024).

Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

90.     In fact, a study by the Identity Theft Resource Center[10] shows the multitude of harms caused by fraudulent use of PII:



91.     PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[11]

92.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

---

[10] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on June 12, 2024).

[11] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on June 12, 2024).

93.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[12]

94.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

95.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[13]

96.     The ramifications of TalentLaunch's failure to keep its clients' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

97.     Here, not only was sensitive medical information compromised, but financial information and Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity

---

[12] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on June 12,, 2024).

[13] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on June 12, 2024).

thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

98.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[14]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

99.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

100.     As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

### I.   *Plaintiffs' and Class Members' Damages*

*Plaintiff James Christian's Experience*

101.     When Plaintiff Christian became a client, Defendant required Plaintiff Christian to provide it with substantial amounts of his Private Information. Plaintiff Christian would not have provided his Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' personal and health information from theft, and that those systems were subject to a data breach.

---

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/products/gao-07-737 (last visited June 12, 2024).

102.    Plaintiff Christian is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

103.    In or about March 2024, Plaintiff Christian received a letter entitled "Important Information Please Review Carefully" which told him that his Private Information had been impacted during the Data Breach. The notice letter informed him that the Private Information stolen included his "names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, passport numbers, financial account information, digital signatures, medical information, health insurance information, biometric information, and mother's maiden names."

104.    The notice letter offered Plaintiff Christian limited and temporary credit monitoring services, despite the lifetime risk of identity theft that he now faces.

105.    Plaintiff Christian suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud. As a result of the Data Breach, Plaintiff Christian made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Christian has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

106. As a result of the Data Breach, Plaintiff Christian anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms that have been or will be caused by the Data Breach.

107. Shortly after the Data Breach, Plaintiff Christian received notice from Smart Monitoring alerting him that his Private Information was located on the dark web, thus confirming his Private Information is now in the hands of cybercriminals.

108. Shortly after the Data Breach, Plaintiff Christian experienced multiple unauthorized charges on his PayPal account. Upon information and belief, the wide range of information stolen in the Data Breach was used to gain unauthorized access to his Paypal account.

109. Since the Data Breach, Plaintiff Christian has experienced a dramatic increase in spam and scam phone calls and text messages. Although the notice letter sent to Plaintiff Christian did not specifically mention his phone number or email address, upon information and belief, Plaintiff Christian's contact information was compromised in the Data Breach because it would have been included in any documents that also included the Private Information identified in the notice letter.

110. Plaintiff Christian suffered actual injury in the form of diminution in or deprivation of the value of his Private Information – intangible property that Plaintiff Christian entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

111. Plaintiff Christian suffered an injury analogous to the invasion of his privacy when unauthorized third parties accessed his Private Information. Plaintiff Christian will suffer

an additional privacy injury each time his Private Information is subsequently sold, viewed, or misused by unauthorized third parties.

112.    As a result of the Data Breach, Plaintiff Christian has suffered stress and anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Christian is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

113.    Plaintiff Christian will continue to face a substantial risk of imminent harm from the Data Breach for the rest of his life.

114.    Plaintiff Christian has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

*Plaintiff Steve Buyck's Experience*

115.    When Plaintiff Buyck became a client, Defendant required Plaintiff Buyck to provide it with substantial amounts of his Private Information. Plaintiff Buyck would not have provided his Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' personal and health information from theft, and that those systems were subject to a data breach.

116.    Plaintiff Buyck is very careful about sharing his sensitive Private Information. Plaintiff Buyck stores any documents containing his Private Information in a safe and secure

location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

117.    In or about March 2024, Plaintiff Buyck received a letter entitled "Important Information Please Review Carefully" which told him that his Private Information had been impacted during the Data Breach. The notice letter informed him that the Private Information stolen included his "names, dates of birth, Social Security numbers, driver's license numbers, state identification numbers, passport numbers, financial account information, digital signatures, medical information, health insurance information, biometric information, and mother's maiden names."

118.    The notice letter offered Plaintiff Buyck limited and temporary credit monitoring services, despite the lifetime risk of identity theft that he now faces.

119.    Shortly after the Data Breach, Plaintiff Buyck received a notice from Experian alerting him that his contact information was located on the dark web, thus confirming his Private Information is now in the hands of cybercriminals. Although the notice letter sent to Plaintiff Buyck did not specifically mention his contact information, upon information and belief, Plaintiff Buyck's contact information was compromised in the Data Breach because it would have been included in any documents that also included the Private Information identified in the notice letter.

120.    Plaintiff Buyck suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud. This includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

121.    Plaintiff Buyck has and will spend considerable time and effort monitoring his accounts in the future to protect himself from additional identity theft. Plaintiff Buyck fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach.

122.    Plaintiff Buyck suffered actual injury in the form of diminution in or deprivation of the value of his Private Information – intangible property that Plaintiff Buyck entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

123.    Plaintiff Buyck suffered an injury analogous to the invasion of his privacy when unauthorized third parties accessed his Private Information. Plaintiff Buyck will suffer an additional privacy injury each time his Private Information is subsequently sold, viewed, or misused by unauthorized third parties.

124.    As a result of the Data Breach, Plaintiff Buyck has suffered stress and anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Buyck is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

125.    Plaintiff Buyck will continue to face a substantial risk of imminent harm from the Data Breach for the rest of his life.

126.    Plaintiff Buyck has a continuing interest in ensuring that his Private Information which remains in the possession of Defendant, is protected and safeguarded from future breaches.

28

*Plaintiff Charles Leland Perry III's Experience*

127.    Plaintiff Perry III is a former employee at Bonney Staffing, Defendant's parent company, having worked there in or about 2017. As a condition of his employment at Bonney Staffing, Plaintiff Perry III was required to supply Defendant with his Private Information. Plaintiff Perry III would not have provided his Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' personal and health information from theft, and that those systems were subject to a data breach.

128.    Plaintiff Perry III is very careful about sharing his sensitive Private Information. Plaintiff Perry III stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

129.    In or about March 2024, Plaintiff Perry III received a letter entitled "Important Information Please Review Carefully" which told him that his Private Information had been impacted during the Data Breach. The notice letter informed him that the Private Information stolen included his full name and Social Security number.

130.    The notice letter offered Plaintiff Perry III limited and temporary credit monitoring services, despite the lifetime risk of identity theft that he now faces.

131.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Perry III to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis[,]"[15] Plaintiff Perry III made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  researching and verifying the legitimacy of the Data Breach, changing passwords and

---

[15] Notice Letter.

resecuring his own computer network, and monitoring his credit card statements and credit reports for any unusual activity. Plaintiff Perry III has spent significant time on mitigation activities in response to the Data Breach--valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

132.    As a result of the Data Breach, Plaintiff Perry III anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms that have been or will be caused by the Data Breach.

133.    Plaintiff Perry III also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. Although the notice letter sent to Plaintiff Buyck did not specifically mention his contact information, upon information and belief, Plaintiff Buyck's contact information was compromised in the Data Breach because it would have been included in any documents that also included the Private Information identified in the notice letter.

134.    Plaintiff Perry III suffered actual injury in the form of diminution in or deprivation of the value of his Private Information – intangible property that Plaintiff Perry III entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

135.    Plaintiff Perry III suffered an injury analogous to the invasion of his privacy when unauthorized third parties accessed his Private Information. Plaintiff Perry III will suffer an additional privacy injury each time his Private Information is subsequently sold, viewed, or misused by unauthorized third parties.

136.    As a result of the Data Breach, Plaintiff Perry III has suffered stress and anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Perry III is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

137.    Plaintiff Perry III will continue to face a substantial risk of imminent harm from the Data Breach for the rest of his life.

138.    Plaintiff Perry III has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendant, are protected and safeguarded from future breaches.

*Plaintiff David Barker's Experience*

139.    When Plaintiff Barker engaged the Defendant, Defendant required Plaintiff Barker to provide it with substantial amounts of his Private Information. Plaintiff Barker would not have provided his Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' personal and health information from theft, and that those systems were subject to a data breach.

140.    Plaintiff Barker is very careful about sharing his sensitive Private Information. Plaintiff Barker stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

141.    In or about March 2024, Plaintiff Barker received a letter entitled "Important Information Please Review Carefully" which told him that his Private Information had been impacted during the Data Breach. The notice letter informed him that the Private Information stolen included his name and social security number.

142.    The notice letter offered Plaintiff Barker limited and temporary credit monitoring services, despite the lifetime risk of identity theft that he now faces.

143.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Barker made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, changing passwords and resecuring his own computer network, and contacting companies regarding suspicious activity on his accounts. Plaintiff Barker has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

144.    As a result of the Data Breach, Plaintiff Barker anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms that have been or will be caused by the Data Breach.

145.    Plaintiff Barker suffered actual injury in the form of diminution in or deprivation of the value of his Private Information – intangible property that Plaintiff Barker entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

146.    Plaintiff Barker suffered an injury analogous to the invasion of his privacy when unauthorized third parties accessed his Private Information. Plaintiff Barker will suffer an

additional privacy injury each time his Private Information is subsequently sold, viewed, or misused by unauthorized third parties.

147.    As a result of the Data Breach, Plaintiff Barker has suffered stress and anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Barker is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

148.    Plaintiff Barker will continue to face a substantial risk of imminent harm from the Data Breach for the rest of his life.

149.    Plaintiff Barker has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

*Plaintiff Amanda Lenz's Experience*

150.    When Plaintiff Lenz provided her Private Information to the Defendant for purposes of evaluating her for employment opportunities, Defendant required Plaintiff Lenz to provide it with substantial amounts of her Private Information. Plaintiff Lenz would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' personal and health information from theft, and that those systems were subject to a data breach.

151.    Plaintiff Lenz is very careful about sharing her sensitive PII. Plaintiff stores any

documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Lenz over the internet or any other unsecured source. Plaintiff Lenz would not have entrusted her PII to Defendant had he known of Defendant's lax data security policies.

152. On or about March 8, 2024,Plaintiff Lenz received a letter entitled "Important Information Please Review Carefully" which told her that her Private Information was impacted during the Data Breach. The notice letter informed her that the Private Information stolen included her name and social security number.

153. The notice letter offered Plaintiff Lenz limited and temporary credit monitoring services, despite the lifetime risk of identity theft that she now faces.

154. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Lenz made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, changing passwords and resecuring her own computer network, and contacting companies regarding suspicious activity on his accounts. Plaintiff Lenz has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

155. As a result of the Data Breach, Plaintiff Lenz anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms that have been or will be caused by the Data Breach.

156. Plaintiff Lenz suffered actual injury in the form of diminution in or deprivation of the value of her Private Information – intangible property that Plaintiff Lenz entrusted to

Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of, the Data Breach.

157.    Plaintiff Lenz suffered an injury analogous to the invasion of her privacy when unauthorized third parties accessed her Private Information. Plaintiff Lenz will suffer an additional privacy injury each time her Private Information is subsequently sold, viewed, or misused by unauthorized third parties.

158.    As a result of the Data Breach, Plaintiff Lenz has suffered stress and anxiety as a result of the release of his Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Lenz is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

159.    Plaintiff Lenz will continue to face a substantial risk of imminent harm from the Data Breach for the rest of her life.

160.    Plaintiff Lenz has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

*Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft*

161.    In sum, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

162. Plaintiffs and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

163. Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

164. As a direct and proximate result of TalentLaunch's actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns and insurance claims filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

165. Further, and as set forth above, as a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

166. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

167. Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private

Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

168.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

169.    Plaintiffs and Class Members also lost the benefit of the bargain they made with TalentLaunch. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiffs and Class Members paid to TalentLaunch was intended to be used by TalentLaunch to fund adequate security of TalentLaunch's system and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive the benefit of the bargain.

170.    Additionally, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[16] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[17]

171.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable

---

[16] *See*
https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on June 12, 2024).

[17] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel,
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on June 12, 2024).

information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

172.    Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

173.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of TalentLaunch, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its clients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

174.    As a direct and proximate result of TalentLaunch's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.      CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

176.    Specifically, Plaintiffs propose the following Nationwide Class definition (also referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

177.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

178.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

179.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

180.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of 119,261 clients of TalentLaunch whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through TalentLaunch's records, Class Members' records, publication notice, self-identification, and other means.

181.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.   Whether TalentLaunch engaged in the conduct alleged herein;

        b.   Whether TalentLaunch's conduct violated the FTCA and HIPAA;

        c.   When TalentLaunch learned of the Data Breach;

d.   Whether TalentLaunch's response to the Data Breach was adequate;

e.   Whether TalentLaunch unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f.   Whether TalentLaunch failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.   Whether TalentLaunch's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   Whether TalentLaunch's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether TalentLaunch owed a duty to Class Members to safeguard their Private Information;

j.   Whether TalentLaunch breached its duty to Class Members to safeguard their Private Information;

k.   Whether hackers obtained Class Members' Private Information via the Data Breach;

l.   Whether TalentLaunch had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.   Whether TalentLaunch breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.   Whether TalentLaunch knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiffs and Class Members suffered as a result of TalentLaunch's misconduct;

p.  Whether TalentLaunch's conduct was negligent;

q.  Whether TalentLaunch's conduct was *per se* negligent;

r.  Whether TalentLaunch was unjustly enriched;

s.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

182.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of TalentLaunch. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

183.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

184.  <u>Predominance</u>. TalentLaunch has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the

same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from TalentLaunch's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

185.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for TalentLaunch. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

186.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). TalentLaunch has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

187.    Finally, all members of the proposed Class are readily ascertainable. TalentLaunch has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by TalentLaunch.

## **CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**NEGLIGENCE**
(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

188.    Plaintiffs restate and reallege all of the allegations stated above as if fully set forth herein, with the exception of any allegations that allege the existence of an enforceable contract.

189.    TalentLaunch knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

190.    TalentLaunch's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

191.    TalentLaunch knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. TalentLaunch was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

192.    TalentLaunch owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. TalentLaunch's duties included, but were not limited to, the following:

> a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;
>
> b.   To protect clients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.  To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d.  To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.  To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

193.  TalentLaunch's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. A similar duty arose under the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Revised Code 1345.01, *et seq*.

194.  TalentLaunch's duty also arose because Defendant was bound by industry standards to protect its clients' confidential Private Information.

195.  Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and TalentLaunch owed them a duty of care to not subject them to an unreasonable risk of harm.

196.  Defendant's duty of care to Plaintiffs and Class Members is independent from and untethered to any contract.

197.    TalentLaunch, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within TalentLaunch's possession.

198.    TalentLaunch, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

199.    TalentLaunch, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

200.    TalentLaunch breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b.  Failing to adequately monitor the security of its networks and systems;

   c.  Failing to periodically ensure that its email system maintained reasonable data security safeguards;

   d.  Allowing unauthorized access to Class Members' Private Information;

   e.  Failing to comply with the FTCA or CSPA;

   f.  Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

201.   TalentLaunch acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

202.   TalentLaunch had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust TalentLaunch with their Private Information was predicated on the understanding that TalentLaunch would take adequate security precautions. Moreover, only TalentLaunch had the ability to protect its systems (and the Private Information that it stored on them) from attack.

203.   TalentLaunch's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated as alleged herein.

204.   As a result of TalentLaunch's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

205.   TalentLaunch's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

206.    As a result of TalentLaunch's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

207.    TalentLaunch also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

208.    As a direct and proximate result of TalentLaunch's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

209.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

210.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

211.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring TalentLaunch to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

### COUNT II
### NEGLIGENCE *PER SE*
#### (On behalf of Plaintiffs and the Nationwide Class)

212.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, with the exception of any allegations that allege the existence of an enforceable contract.

213.     Pursuant to Section 5 of the FTCA, TalentLaunch had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

214.     Pursuant to the CSPA, Ohio Revised Code 1345.01, *et seq.*, TalentLaunch had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

215.     Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, TalentLaunch had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

216.     Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

217.     TalentLaunch breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

218.     Specifically, TalentLaunch breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

219.     The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data

48

Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of TalentLaunch's duty in this regard. The CSPA imposes a similar duty.

220. TalentLaunch also violated the FTCA, the CSPA, and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

221. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to TalentLaunch's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

222. Plaintiffs and Class Members are within the class of persons that the FTCA, the CSPA, and HIPAA are intended to protect and TalentLaunch's failure to comply with both constitutes negligence *per se*.

223. Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to TalentLaunch's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

224. As a direct and proximate result of TalentLaunch's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

225. As a direct and proximate result of TalentLaunch's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

226. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring TalentLaunch to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF CONTRACT**
(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

227. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, with the exception that Plaintiffs' breach of contract claim is brought in the alternative to any claims arising in tort or equity.

228. Plaintiffs and Class Members entered into a valid and enforceable contract through which they paid money to TalentLaunch in exchange for services. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiffs' and Class Members' Private Information.

229. TalentLaunch's Privacy Policy memorialized the rights and obligations of TalentLaunch and its clients. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

230. In the Privacy Policy and its Notice letter, TalentLaunch commits to protecting the privacy and security of private information and promises to never share Plaintiffs' and Class Members' Private Information except under certain limited circumstances.

231.    Plaintiffs and Class Members fully performed their obligations under their contracts with TalentLaunch.

232.    However, TalentLaunch did not secure, safeguard, and/or keep private Plaintiffs' and Class Members' Private Information, and therefore TalentLaunch breached its contracts with Plaintiffs and Class Members.

233.    TalentLaunch allowed third parties to access, copy, and/or exfiltrate Plaintiffs' and Class Members' Private Information without permission. Therefore, TalentLaunch breached the Privacy Policy with Plaintiffs and Class Members.

234.    TalentLaunch's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA, CSPA, HIPAA, and applicable industry standards, resulted in TalentLaunch providing services to Plaintiffs and Class Members that were of a diminished value.

235.    As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendant's failure to fully perform its part of the bargain with Plaintiffs and Class Members.

236.    As a direct and proximate result of TalentLaunch's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

237.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring TalentLaunch to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

238.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, with the exception that Plaintiffs' breach of implied contract claim is brought in the alternative to any claims arising in tort or equity.

239.    TalentLaunch provides staffing and recruitment services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

240.    Through Defendant's sale of services to Plaintiffs and Class Members, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

241.    As consideration, Plaintiffs and Class Members paid money to TalentLaunch and/or turned over valuable Private Information to TalentLaunch. Accordingly, Plaintiffs and Class Members bargained with TalentLaunch to securely maintain and store their Private Information.

242.    TalentLaunch accepted payment and/or possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

243.    In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiffs and Class Members intended and understood that TalentLaunch would adequately safeguard the Private Information as part of those services.

244.    Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

245.    Plaintiffs and Class Members would not have entrusted their Private Information to TalentLaunch in the absence of such an implied contract.

246.    Had TalentLaunch disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to TalentLaunch.

247.    As a staffing and recruitment firm, TalentLaunch recognized (or should have recognized) that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

248.    TalentLaunch violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. TalentLaunch further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

249.    Additionally, TalentLaunch breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

250.    TalentLaunch also breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1).

251.    TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1).

252.    TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii).

253.    TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2).

254.    TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3).

255. TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 C.F.R. § 164.306(a)(94).

256. TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. § 164.502, *et seq.*

257. TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. § 164.530(c).

258. TalentLaunch further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

259. A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to TalentLaunch in exchange for TalentLaunch's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

260. Plaintiffs and Class Members have been damaged by TalentLaunch's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT V
## UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

261.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, with the exception that this claim is brought in the alternative to any claims arising in tort or contract.

262.    Plaintiffs and Class Members conferred a benefit on TalentLaunch by turning over their Private Information to Defendant and by paying for services that should have included cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protection.

263.    Upon information and belief, TalentLaunch funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiffs and Class Members.

264.    As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to TalentLaunch.

265.    TalentLaunch has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

266.    TalentLaunch knew that Plaintiffs and Class Members conferred a benefit upon it, which TalentLaunch accepted. TalentLaunch profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

267.     If Plaintiffs and Class Members had known that TalentLaunch had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

268.     Due to TalentLaunch's conduct alleged herein, it would be unjust and inequitable under the circumstances for TalentLaunch to be permitted to retain the benefit of its wrongful conduct.

269.     As a direct and proximate result of TalentLaunch's conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in TalentLaunch's possession and is subject to further unauthorized disclosures so long as TalentLaunch fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

270.     Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from TalentLaunch and/or an order proportionally disgorging all profits, benefits, and

other compensation obtained by TalentLaunch from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

271. Plaintiffs and Class Members may not have an adequate remedy at law against TalentLaunch, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

272. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, with the exception that this claim is brought in the alternative to any claims arising in tort or contract.

273. In light of the special relationship between TalentLaunch and its clients, whereby TalentLaunch became a guardian of Plaintiffs' and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) TalentLaunch was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its clients, including Plaintiffs and Class Members. This benefit included (1) the safeguarding of Plaintiffs' and Class Members' Private Information; (2) timely notifying Plaintiffs and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where TalentLaunch's clients' Private Information was and is stored.

274. TalentLaunch had a fiduciary duty to act for the benefit of Plaintiffs and the Class upon matters within the scope of its clients' relationship, in particular to keep the Private Information secure.

275. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently investigate the Data Breach to determine the number of Class Members affected and notify them within a reasonable and practicable period of time.

276. TalentLaunch breached its fiduciary duties to Plaintiffs and the Class by failing to protect their Private Information.

277. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic PHI TalentLaunch created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

278. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

279. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

280. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

281. TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR 164.306(a)(2).

282.    TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

283.    TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 CFR 164.306(a)(94).

284.    TalentLaunch breached its fiduciary duties to Plaintiffs and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

285.    As a direct and proximate result of TalentLaunch's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

### COUNT VII
### DECLARATORY JUDGMENT
#### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

286.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

287.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

288.    TalentLaunch owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

289.    TalentLaunch still possesses Private Information regarding Plaintiffs and Class Members.

290.    Plaintiffs allege that TalentLaunch's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of his Private Information and the risk remains that further compromises of his Private Information will occur in the future.

291.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.  TalentLaunch owes a legal duty to secure its clients' Private Information and to timely notify customers of a data breach under the common law, HIPAA, and the FTCA;

    b.  TalentLaunch's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect clients' Private Information; and

    c.  TalentLaunch continues to breach this legal duty by failing to employ reasonable measures to secure clients' Private Information.

292.    This Court should also issue corresponding prospective injunctive relief requiring TalentLaunch to employ adequate security protocols consistent with legal and industry standards to protect clients' Private Information, including the following:

a.  Order TalentLaunch to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, TalentLaunch must implement and maintain reasonable security measures, including, but not limited to:

    i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on TalentLaunch's systems on a periodic basis, and ordering TalentLaunch to promptly correct any problems or issues detected by such third-party security auditors;

    ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

    iv.  segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of TalentLaunch's systems;

    v.  conducting regular database scanning and security checks;

    vi.  routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.     meaningfully educating its clients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

293.    If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at TalentLaunch. The risk of another such breach is real, immediate, and substantial. If another breach at TalentLaunch occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

294.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to TalentLaunch if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of TalentLaunch's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and TalentLaunch has a pre-existing legal obligation to employ such measures.

295.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at TalentLaunch, thus preventing future injury to Plaintiffs and other clients whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a.    An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and

finding that Plaintiffs are a proper representative of the Nationwide Class requested herein;

b.  Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing TalentLaunch to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring TalentLaunch to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATED: June 12, 2024                    Respectfully submitted,

/s/Brian D. Flick
Brian D. Flick (0081605)
Marc E. Dann (0039425)
Marita I. Ramirez (0101882)
DannLaw
15000 Madison Ave.
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 – fax
notices@dannlaw.com

Mason A. Barney*
Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com

Samuel J. Strauss*
Raina Borrelli*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave. Ste. 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*

Gary M. Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Pro Hac Vice application forthcoming
*Counsel for Plaintiffs and the Proposed Class*